UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X   Case No.: 1:22-cv-08045
RONNIE BAPTISTE,

                Plaintiff,

                                                **COMPLAINT**

   -against-

                                                Plaintiff Demands a

THE BANK OF NEW YORK MELLON, BNY           Trial by Jury
MELLON CENTER, MAGDELINA PALCZYNSKA,
individually, and BRIAN MAUNEY, individually,

                Defendants.
-------------------------------------------------------------------X

Plaintiff Ronnie Baptiste, by and through her attorneys, Phillips & Associates, PLLC, hereby complains of the Defendants, upon information and belief, as follows:

## NATURE OF THE CASE

1. Plaintiff complains pursuant to 42 U.S.C. §1981, and to remedy violations of the New York State Human Rights Law, New York State Executive Law, §§ 296 et seq. ("NYSHRL"), and the New York City Human Rights Law, New York City Administrative Code §§ 8-107 *et. seq*. ("NYCHRL"), based upon the supplemental jurisdiction of this Court pursuant to *Gibbs*, 38 U.S. 715 (1966) and 28 U.S.C. § 1367, seeking damages to redress the injuries she has suffered as a result of being harassed and discriminated against by Defendants on the basis of her race, together with creating a hostile work environment, retaliation, and unlawful termination.

## JURISDICTION AND VENUE

2. The Court has jurisdiction pursuant to 42 U.S.C. §1981; 28 U.S.C. § 1331, § 1343, and supplemental jurisdiction thereto.

3. This action involves a Question of Federal Law.

1

4. Venue is proper in this district based upon the fact that a substantial part of the events and omissions giving rise to the claim occurred within the Southern District of New York. 28 U.S.C. §1391(b).

## PARTIES

5. Plaintiff is an African-American female resident of the State of New York, County of Kings.

6. At all times material, Defendant THE BANK OF NEW YORK MELLON, BNY MELLON CENTER (hereinafter also referred to as "BNY MELLON") was and is a foreign limited liability company, duly incorporated under the laws of the State of Delaware.

7. At all times material, Defendant BNY MELLON is authorized to operate, and does operate under the laws of the State of New York.

8. Defendant BNY MELLON is a publicly-traded global financial services company located at 240 Greenwich Street, New York, NY 10826.

9. At all times material, Defendant MAGDELINA PALCZYNSKA (hereinafter also referred to as "PALCZYNSKA") is a Caucasian female resident of the State of New York.

10. At all times material, Defendant PALCZYNSKA was the "Head of Investor Relations" at Defendant BNY MELLON.

11. At all times material, Defendant PALCZYNSKA was Plaintiff's supervisor and/or had supervisory authority over Plaintiff.

12. At all times material, Defendant BRIAN MAUNEY (hereinafter also referred to as "MAUNEY") is a Caucasian male resident of the State of New York.

13. At all times material, Defendant MAUNEY was the "Deputy Director of Investor Relations" at Defendant BNY MELLON.

14. At all times material, Defendant BRIAN MAUNEY was Plaintiff's supervisor and/or had supervisory authority over Plaintiff.

15. Defendant BNY MELLON, Defendant PALCZYNSKA, and Defendant MAUNEY are herein collectively referred to as "Defendants."

16. At all times material, Plaintiff was an employee of Defendants.

## MATERIAL FACTS

17. On or about August 7, 2017, Plaintiff began working for Defendant BNY MELLON's Markets Foreign Exchange Department as a temporary Executive Assistant, earning $40 per hour. Plaintiff's duties included providing administrative support for the Foreign Exchange team, scheduling meetings, and invoicing. In that role, Plaintiff reported to Head of Foreign Exchange, Adam Vos, and Chief Operating Officer, Jason Vitale.

18. In or around December 2017, based on her strong performance, Plaintiff was hired for a permanent role as an Executive Assistant, earning a salary of $75,000 per year.

19. In or around the Spring of 2019, Mr. Vos was promoted to another role within the Foreign Exchange team, so he no longer supervised Plaintiff. However, Plaintiff continued reporting to Mr. Vitale.

20. In or around May 2019, Plaintiff learned that there was an Executive Assistant job opening in the Investor Relations department. Plaintiff was interested in making a change, so she applied for a transfer, and her request was granted.

21. Shortly after, Plaintiff began reporting to Defendant PALCZYNSKA and Defendant MAUNEY.

22. Initially, Plaintiff had a positive working experience with her new supervisors.

23. However, Plaintiff soon learned that Defendant PALCZYNSKA and Defendant MAUNEY harbored a discriminatory animus toward African-Americans.

24. For example, on or around December 2019, Plaintiff, Defendant PALCZYNSKA and Defendant MAUNEY attended a Goldman Sachs conference. During a presentation by Invesco's Senior Portfolio Manager, Devin Armstrong (African-American), and in Defendant MAUNEY's presence, Defendant PALCZYNSKA stated, "[Mr. Armstrong] looks so scary." Plaintiff was offended by Defendant PALCZYNSKA's stereotypical remark about African-American men as "scary."

25. On or about February 11, 2020, at work, the employees in the Investor Relations department were watching a CNBC live stream of Federal Reserve Chair, Jerome H. Powell's testimony concerning the "Semiannual Monetary Policy Report to the Congress" about the state of United States' economy.[1]  During the presentation, Congressman Al Green (African-American) asked Mr. Powell a series of questions about his testimony.

26. While Mr. Green was speaking, Defendant PALCZYNSKA asked, "Who is this? [Al Green] look so scary when he speaks. *Who is that*?"  Defendant MAUNEY then asked, "**Is that [Jerome Powell]?  It would be scary to wake up looking like a gorilla**," referring to Al Green. Plaintiff was stunned and offended by Defendant PALCZYNSKA and Defendant MAUNEY's racist and stereotypical remark insinuating that all African-Americans look the same and/or look like gorillas.

27. That same day, Plaintiff called the Equal Employment Opportunity Commission (EEOC)'s Inquiry hotline to make a complaint about the incident.  Plaintiff gave details about the incident and received instructions about proceeding with filing a Claim.

---

[1] "Watch Live: Fed Chair Powell testifies on economy and monetary policy." https://www.youtube.com/watch?v=Id-d88C057U (last visited May 6, 2022).

28. Shortly after, Plaintiff also called Senior Employee Relations Consultant, Kristina Glasier, to complain about Defendant PALCZYNSKA and Defendant MAUNEY's racial remarks.

29. Before asking Plaintiff any questions about the incident, Ms. Glasier first asked Plaintiff whether she was recording their conversation, and whether she (Plaintiff) was alone, or accompanied by anyone while making the call.  Plaintiff was intimidated by Ms. Glasier's questions but confirmed that she was not recording the call and that she was alone.

30. Then, Plaintiff reiterated Defendant PALCZYNSKA and Defendant MAUNEY's racial remarks.  Ms. Glasier asked Plaintiff whether there were any other employees present while the comments were made.  Plaintiff stated that her colleague, Grace C. (full last name currently unknown)(Hispanic) was also seated in a nearby cubicle, within earshot of the incident.

31. During the call, Plaintiff also complained Defendant PALCZYNSKA about Defendant PALCZYNSKA's comment during the Goldman Sachs conference.

32. At the end of the call, Plaintiff told Ms. Glasier that she had contacted the EEOC to complain about the incident.

33. To interfere with Plaintiff's protected rights, Ms. Glasier replied, "Don't worry about the EEOC.  They're going to put this in my lap anyway."  Based on Ms. Glasier's statement, Plaintiff did not file an EEOC complaint.

34. Ms. Glasier assured Plaintiff that she would investigate the incident and contact Plaintiff concerning the outcome.  However, Plaintiff did not receive any further information about the status of the investigation.

35. Instead, the very next day, Plaintiff overheard a conversation between Defendant PALCZYNSKA and Defendant MAUNEY.  Defendant PALCZYNSKA said, "I have to be

careful what I say around here. You never know who could be recording," and laughed along with Defendant MAUNEY. They were referring to Plaintiff's complaint.

36. On or about February 21, 2020, in retaliation for Plaintiff's complaint, Defendant PALCZYNSKA removed Plaintiff's full access to her (Defendant PALCZYNSKA's) calendar, contacts and email, and Plaintiff was no longer able to perform all the duties of her position.

37. Defendant PALCZYNSKA intended to make Plaintiff appear unprepared for her job and to create a paper trail of purported performance issues and/or employee redundancy in order to justify terminating Plaintiff's employment.

38. In or around the beginning of March 2020, Plaintiff complained to Head of Diversity and Inclusion, Jolene Anderson, about her racial complaints against Defendant PALCZYNSKA and Defendant MAUNEY. Plaintiff also complained about Defendant PALCZYNSKA's retaliatory actions. Ms. Anderson acknowledged receiving Plaintiff's complaint, and referred Plaintiff to Vice President of Human Resources, Barbara Blyth, to further follow up concerning her complaint.

39. In or around March 2020, Plaintiff also complained to Ms. Blyth that she no longer had access to Defendant PALCZYNSKA's calendar and she was not receiving any information or directives in order to perform her role.

40. In or around the middle of March 2020, Defendant BNY MELLON's employees began working remotely due to the COVID-19 pandemic.

41. CEO, Ted Gibbons, informed all the employees that Defendant BNY MELLON would not lay off or terminate any of its employees during the COVID-19 pandemic.

42. However, for the remainder of Plaintiff's employment, and in a pattern of retaliatory actions, Defendant PALCZYNSKA and Defendant MAUNEY gradually stripped Plaintiff of her duties and gave her unwarranted performance criticism in order to justify eventually terminating her employment.

43. For example, on or about August 4, 2020, Defendant PALCZYNSKA removed Plaintiff's scheduling duties concerning upcoming CFO meetings in the fall of 2020, and delegated them to another Assistant, Nicola (last name currently unknown).

44. On or about August 5, 2020, Defendant PALCZYNSKA gave Plaintiff a negative performance review based on alleged performance issues that were directly caused by Plaintiff's inability to fully perform her duties since her complaint.

45. For example, in the review, Defendant PALCZYNSKA accused Plaintiff of failing to properly record "call reports." However, Plaintiff did not have access to all the information. In her response to the review, Plaintiff explained, "I have stressed the consequences and troubles of not having full access to [Defendant PALCZYNSKA]'s calendar and meeting update details."

46. That same day, Plaintiff emailed Ms. Blyth and complained about Defendant PALCZYNSKA's retaliatory performance review.

47. That same week, Plaintiff also sent an email to Mr. Gibbons and complained about Defendants' discriminatory and retaliatory actions. In the email, Plaintiff also complained that Ms. Blyth had "closed" her investigation without a resolution. Plaintiff also wrote, "**My responsibilities as [Defendant PALCZYNSKA]'s assistant have been slowly taken away from me and left it difficult to do my job. And most recently, I have been informed by [Defendant PALCZYNSKA] in my review that I am off-track. I strongly believe that this is a result**

**of retaliation based on my citing of racial discrimination**." Mr. Gibbons acknowledged Plaintiff's complaint.

48. On or about August 13, 2020, Plaintiff again complained to Ms. Blyth that Defendant PALCZYNSKA was excluding her from meetings in retaliation for her complaints. For the first time, Ms. Blyth now claimed that Defendant PALCZYNSKA "had the right" to remove those functions from Plaintiff's role.

49. During that conversation, Ms. Blyth also asked Plaintiff, "**If you were to leave, what would you want as far as a severance? Since you don't have access to do your work, and you're saying it's challenging to do your job, what kind of severance do you want**?" Plaintiff was taken back and replied, "I want to continue in my career here and I don't believe I should leave because of my complaints."

50. The next day, Ms. Blyth contacted Plaintiff and referred her to speak with a therapist, Dr. Robert Talbot, about her distress over the workplace harassment. Plaintiff agreed, and attended several videoconference therapy sessions with Dr. Talbot. However the retaliation continued.

51. On or about September 9, 2020, Defendant PALCZYNSKA and Defendant MAUNEY left Plaintiff out of an Investor Relations call, so she was never able to attend the call or prepare a call report. When Plaintiff learned about the call and asked Defendant PALCZYNSKA for details for the report, Defendant PALCZYNSKA simply replied that "[i]t was a very brief call."

52. On or about January 5, 2021, Plaintiff was again excluded from a group Investor Relations meeting that would take place on February 1, 2021. All the other Managers and Assistants in the Investor Relations department were invited to the meeting.

53. On or about January 19, 2021, in further retaliation, Defendant PALCZYNSKA deleted items from the department's shared calendar, and then accused Plaintiff of making a calendar error.

54. On or about February 18, 2021, Defendant PALCZYNSKA once again excluded Plaintiff from a group email scheduling a meeting on her, and Defendant MAUNEY's calendars. Plaintiff only learned about the meeting from another employee's assistant, Sabrina Zimmerman, who included Plaintiff in the group email in order to facilitate scheduling.

55. On or about March 10, 2021, in an email chain with other employees and clients, Defendant MAUNEY accused Plaintiff of creating a scheduling conflict in the calendar. However, an outside party, Mimi Mahoney, clarified that there was no conflict.

56. In or around April 2021, the CFO's assistant (name currently unknown) telephoned Plaintiff and informed her that Defendant PALCZYNSKA would be replaced by another employee, Marius Merz. During their conversation, the assistant said, "I thought you'd be happy to hear it, since [Defendant PALCZYNSKA] says you don't like her."

57. In or around May 2021, Plaintiff began reporting to Marius Merz.

58. Throughout the summer of 2021, Plaintiff had a positive working relationship with Mr. Merz.

59. However, on or about September 6, 2021, the day after Labor Day, Mr. Merz informed Plaintiff that she would be laid off due to "downsizing." However, this was pretext, and Plaintiff was the only employee in the Investor Relations department that lost her job.

60. Defendant BNY MELLON intentionally waited until the end of its "termination freeze," and until Plaintiff was forced to perform only a fraction of her duties, to contrive a non-discriminatory reason to terminate Plaintiff's employment under the guise of "restructuring."

61. Defendants terminated Plaintiff because of her race.

62. Defendants terminated Plaintiff in retaliation for her complaints of race discrimination.

63. Defendants would not have harassed and discriminated against Plaintiff but for her race.

64. As a result of Defendants' actions, Plaintiff felt, and continues to feel, extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

65. As a result of the Defendants' discriminatory and intolerable treatment of Plaintiff, she suffered severe emotional distress and physical ailments.

66. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

67. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages.

**AS A FIRST CAUSE OF ACTION
UNDER FEDERAL LAW
<u>42 U.S.C. SECTION 1981</u>**

68. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

69. 42 U.S.C. Section 1981 states in relevant part as follows:

    a. Statement of equal rights All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

    b. "Make and enforce contracts" defined for purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C.A. § 1981.

70. Plaintiff was discriminated against because of her race as provided under 42 U.S.C. Section 1981 and has suffered damages as set forth herein.

71. Plaintiff also claims hostile work environment and retaliation under 42 U.S.C. Section 1981.

## AS A SECOND CAUSE OF ACTION
## UNDER NEW YORK STATE HUMAN RIGHTS LAW
## <u>DISCRIMINATION</u>

72. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

74. Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's … race … to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

75. Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff on the basis of her race, together with creating a hostile work environment, retaliation, and unlawful termination.

76. Plaintiff hereby makes a claim against Defendants under all applicable paragraphs of Executive Law Section 296.

## AS A THIRD CAUSE OF ACTION
## UNDER NEW YORK STATE HUMAN RIGHTS LAW
## <u>RETALIATION</u>

77. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

78. New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice:

> "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person before he has opposed any practices forbidden under this article."

79. Defendants engaged in an unlawful and retaliatory discriminatory practice by retaliating, and otherwise discriminating against Plaintiff because of her opposition to Defendants' unlawful actions.

## AS A FOURTH CAUSE OF ACTION
## UNDER THE NEW YORK CITY HUMAN RIGHTS LAW
## DISCRIMINATION

80. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

81. The Administrative Code of City of NY § 8-107 [1] provides that "It shall be an unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

82. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against Plaintiff on the basis of her race, together with creating a hostile work environment, retaliation, and unlawful termination.

## AS A FIFTH CAUSE OF ACTION
## UNDER THE NEW YORK CITY HUMAN RIGHTS LAW
## <u>RETALIATION</u>

83. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

84. The New York City Administrative Code Title 8-107(7) provides that:

> "It shall be unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter…"

85. Defendants engaged in an unlawful and retaliatory discriminatory practice by retaliating, and otherwise discriminating against Plaintiff, including, but not limited to terminating Plaintiff.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A. Declaring that the Defendants engaged in unlawful employment practices prohibited by the 42 U.S.C. §1981, the New York State Human Rights Law, and the New York City Human Rights Law on the basis of Plaintiff's race, together with creating a hostile work environment, retaliation, and unlawful termination;

B. Awarding damages to the Plaintiff, retroactive to the date of discharge, for all lost wages and benefits, past and future, back pay and front pay, resulting from Defendants' unlawful discharge and to otherwise make Plaintiff whole for any losses suffered as a result of such unlawful employment practices;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation;

D. Awarding Plaintiff punitive damages;

13

E. Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of this action;

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices.

## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial, plus interest, punitive damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Dated:  September 20, 2022
    New York, NY

By:  _____
**PHILLIPS & ASSOCIATES, PLLC**
*Attorneys for Plaintiff*
Silvia C. Stanciu, Esq.
45 Broadway, Suite 430
New York, NY 10006
(212) 248-7431